# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

| | |
|---|---|
| CHARLES ROGERS, | |
| Plaintiff, | CIVIL ACTION NO.: 6:17-cv-00155 |
| v. | |
| NORMAN W. FRIES, INC. d/b/a CLAXTON POULTRY FARMS, | |
| Defendant. | |

## O R D E R

In this lawsuit, Plaintiff Charles Rogers alleges that Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms violated his rights pursuant to Title I of the Americans with Disabilities Act of 1990, as amended by the ADA Amendment Act of 2008, 42 U.S.C. §12101 *et seq.* (hereinafter the "ADA") by refusing to hire him when he applied for a job in June 2016. (Doc. 5.) The case is presently before the Court on Defendant's Motion for Summary Judgment, in which Defendant argues that Plaintiff cannot show that he was a qualified individual under the ADA. (Doc. 50; doc. 50-1, pp. 10–21.) Defendant additionally argues that summary judgment should be granted on the issue of damages pursuant to an "after-acquired evidence" defense. (Doc. 50-1, p. 21). In response, Plaintiff contends that genuine issues of material fact remain as to whether he was a qualified individual under the ADA, (doc. 57, p. 5), and that a ruling on damages at the summary judgment stage is inappropriate, (doc. 73, p. 11). For the reasons which follow, the Court **GRANTS** Defendant's Motion for Summary Judgment, (doc. 50).[1]

---

[1] In light of its determination that Defendant is entitled to summary judgment disposing of the case in its entirety, the Court declines to address Defendant's request for summary judgment on the after-acquired evidence defense, as it is not a dispositive issue but seeks merely to limit the damages recoverable by

## BACKGROUND

The following facts are relevant to the disposition of Defendant's Motion and, except where specifically noted otherwise, are undisputed.

Defendant operates a raw chicken processing plant in Claxton, Evans County, Georgia. (Doc. 5, p. 3; doc. 11, p. 2; doc. 58, p. 10.) At the plant, chickens are killed, eviscerated, cut up, and processed in various ways. (Doc. 58, p. 27.) The incident giving rise to this case took place in June 2016, when Plaintiff applied to work for Defendant.[2] (Doc. 5, p. 4.) It is undisputed, for purposes of Defendant's Motion for Summary Judgment that Plaintiff was legally blind at the time of this application.[3] (See Doc. 50-2, p. 1; doc. 57-1, p. 1.) While Plaintiff had previously worked for Defendant intermittently between 1998 and 2001, (doc. 63-1, pp. 24–28), the undisputed evidence indicates that his vision had worsened by the time he applied for re-hire in 2016, (see id. at pp. 11–14, 24–28). As described more fully below, Plaintiff was given a conditional offer for a specific job, but Defendant ultimately refused to hire him after it received documentation from his medical provider regarding the limitations resulting from his vision issues. In this lawsuit, Plaintiff challenges Defendant's refusal to hire him as well as its failure to engage in an "interactive process" to attempt to determine and provide a reasonable accommodation so that he could perform the job. (Doc. 5, pp. 14–15.)

Plaintiff if his claim were allowed to proceed. This ground for summary judgment is therefore **DENIED as moot**.

[2] While Plaintiff's Response in opposition to summary judgment offers information regarding a previous occasion—in 2015—when he applied with Defendant, his Amended Complaint does not feature any allegations against Defendant with regard to that particular application and hiring process. (See Doc. 5.) As a result, the Court focuses on the allegations and evidence surrounding the June 2016 application process.

[3] Plaintiff's visual acuity is 20/600. (Doc. 50-2, p. 1; doc. 57-1, p. 1.) Under the Social Security Act, people with a visual acuity of 20/200 or less are "legally blind." 42 U.S.C. §§ 416(i) & 1382c(c) (2016).

## I.     The Application and Interview Process

Defendant's application process has several different parts. (Doc. 50-1, p. 2.) First, applicants must complete an employment application. (Doc. 50-5, pp. 4–6.) Here, Plaintiff testified that a friend of his, who also drove him to the interview, helped him complete the application, explaining, "[H]e would read the questions out and I would give him the answer and he would fill it in[ because] he could write faster and see a lot better than I could." (Doc. 63-1, p. 60.) Per Plaintiff's deposition testimony, in the application, he specifically requested a "seasonal" job, which the Court construes from the context of the surrounding testimony as a reference to a job involved with the "seasoning" process (as opposed to a job that is only available during certain seasons or periods of the year).[4] (Doc. 63-1, pp. 61–62 see also doc. 73, p. 4 (where Plaintiff states, in his Sur-reply, that he "wrote on the application for the Defendant[] that he was applying for the position of seasoning meat . . .").) Plaintiff's application was given to Defendant's human resources representative, Mr. Prater, who reviewed it and also reviewed Defendant's record from his previous employment at the plant, in order to determine if Plaintiff had any disqualifying factors related to his prior employment and severance. (Doc. 50-5, p. 45; doc. 50-1, pp. 2–3.) After determining that nothing from Plaintiff's previous employment with the company made him ineligible, Plaintiff was called in for an interview with Mr. Prater, who, according to Plaintiff, "got on his computer screen and . . . told [Plaintiff] that [the type of job he requested] was open." (Doc.

---

[4] In his Amended Complaint and also in his Brief in Opposition to the Motion for Summary Judgment, Plaintiff alleges that, during his interview, he and Ken Prater, who worked in Defendant's human resources department, discussed positions involving not only "meat seasoning" (also referred to at times as "nugget seasoning") but also "nugget counting." (Doc. 5, pp. 8–9; doc. 57, p. 2.) However, Plaintiff's deposition testimony indicates that any potential "nugget counting" job was only discussed at a job interview in 2015, which is not at issue in this lawsuit and that he and Mr. Prater discussed a job "season[ing] chicken" in the 2016 interview. (Doc. 63-1, pp. 47–48, 61–62.) Furthermore, Defendant denies the existence of a position called "nugget counting" at the plant. (Doc. 50-8, p. 1.) Thus, the Court finds that the undisputed evidence indicates that the only job position at issue in this case was one involving seasoning, and not one involving nugget counting.

50-6, pp. 2–3.)  Plaintiff claims that Mr. Prater told him that the available position would involve "seasoning chicken," including "put[ting] it in the tub."  (Doc. 63-1, p. 62.)  He also claims that at this point he discussed the fact that he was legally blind with Mr. Prater.  (Id. at pp. 61–62.)  According to Plaintiff, Mr. Prater told him that he would "be able to do this," that "it was a pretty easy job," and was "something [Plaintiff] can do."  (Id. at p. 62.)  At this time, Mr. Prater gave Plaintiff a "conditional offer of employment" for the job.  (Doc. 50-2, p. 6; doc. 57-1, p. 7; see also doc. 50-6, pp. 3, 6.)  Plaintiff, however, would still need to be cleared for the employment by the plant nurse.  (Do. 62-1, pp. 17, 21.)

### A.    Plaintiff was Offered a Job as a "Marination Mixer"

It is undisputed that the at-issue position was "on the seasoning line" at the plant.  (See Doc. 50-2, p. 6; doc. 57-1, p. 7.)  Plaintiff refers to it only as "meat seasoning" or "nugget seasoning," (doc. 5, pp. 8–9; doc. 57, p. 2), but there are multiple jobs on the seasoning line. Plaintiff's testimony that he was being considered for a job involving the use of a "tub" to "season chicken" matches most closely the specific position on the plant's seasoning line known as "marination mixer."  (Doc. 50-8, pp. 2–3; doc. 63-1, p. 62.)  In an effort to refute this as the specific job that was offered to him, Plaintiff's Brief in Opposition to Summary Judgment repeatedly asserts that the term "marination" was never used in Plaintiff's interview and therefore this cannot be the position he was being offered.  (Doc. 57, p. 2 (citing doc. 63-1, p. 50).)  In support of his claim that the word "marination" was never used, Plaintiff cites to his own deposition transcript. However, the specific page to which he cites does not include any testimony on this point and is actually a portion of his testimony in which was discussing his 2015 interview for re-hire, not the at-issue 2016 interview.  (See id.; see also id. at p. 10 (citing to "Monroe Depo Pg. 26, 1. 16–24," which also does not support this assertion).)  Additionally, Plaintiff fails to point to any evidence

to support a determination that the at-issue position was not the "marination mixer" job or to support a finding that Plaintiff's description instead matches up with some other position at the plant.

###### B. Overview of the Seasoning Line and the "Marination Mixer" Position

Employees holding a marination mixer position at the plant are responsible for applying spices and seasoning to the chicken. (Doc. 50-8, p. 2.) The job requires the employee to operate and interact with multiple large machines: a "tumbler," a "hopper," and a "marination tank." (Id.; see also doc. 50-9, p. 2.) Specifically, employees in this position must "lift[] and measure[] 30 pound bags of spices into a massive hopper to be mixed with . . . [raw] chicken pieces [that have already been placed in a] large tumbler," which is described as being "like a concrete mixer." (Doc. 50-8, p. 2.) Employees must weigh and mix the seasoning exactly according to the specific instructions of each of Defendant's customers. (Id.) The employees in this position also must "visually monitor the equipment" during the process, "to ensure that the chicken is tumbled and marinated for the correct amount of time." (Id.) During the process, employees are also required to climb stairs, to use hand trucks to transport items, and to "unload" the batch from the tumbler at the end of the tumbling cycle. (Doc. 50-9, p. 2.) The area where the job is performed includes a conveyor belt that moves the marinated chicken pieces from the marination tank to an area where they are scooped and prepared for shipment. (Doc. 50-5, pp. 17–18; doc. 50–8, p. 2.)

The other positions on the seasoning line are scooper/scale operator, packer, and floorman. (Doc. 50-8, p. 1.) All employees on the seasoning line are cross-trained to perform all of the jobs on the line to ensure that all jobs are covered in the event of employee absences or restroom breaks. (Id. at p. 2.) All of the positions on the seasoning line, however, involve interaction with or the operation of equipment and machinery. (Id.; see also docs. 50-10, 50-11, 50-12.)

The plant environment in general presents varying hazards, including standing water, chicken fat and chicken pieces on the floor, water hoses "strewn about," moving conveyor belts, moving motorized pallet jacks and forklifts, and sharp cutting wheels. (Doc. 50-8, p. 3.) Defendant presented evidence that "[o]ne must often duck under machinery in order to move from one place to another," and, "in order to get to the seasoning lines from the entrance of the facility, one must walk through a very complicated maze of machinery and also avoid the hazards [already listed]." (Id.)

## II.    The Medical Screening Process

After conditionally offering Plaintiff the marination mixer position, Mr. Prater directed Plaintiff to the plant nurse's office for the preemployment medical screening portion of the process, during which Plaintiff was required to fill out a medical questionnaire. (Doc. 50-6, p. 4; doc. 50-5, p. 9; see also doc. 61-1, pp. 15–16.) The questionnaire was designed to help Defendant determine whether an applicant can safely perform the at-issue job or whether there are any medical issues that could impact the applicant's job performance. (Doc. 50-5, p. 9; doc. 50-7, p. 2.) If more information was needed, the plant nurse would tell the applicant to have his or her medical care provider fill out a Pre-employment Medical Screening Form. (Doc. 50-4, p. 38; doc. 50–5, p. 10; doc. 50-7, pp. 2–3.)

On his medical questionnaire, Plaintiff wrote, *inter alia*, that he had a "little vision issue" and that he had previously hurt his wrist. (Doc. 50-2, p. 6; doc. 57-1, p. 7; see also doc. 50-4, pp. 36–37.) Annette Monroe, the plant nurse, reviewed the document and, in light of these two disclosures regarding potential physical limitations, she directed him to have both his general physician and his eye doctor complete Pre-employment Medical Screening forms (which she provided to him). (Doc. 61-1, pp. 17–18; doc. 63-1, p. 64; doc. 50-5, p. 12.) These forms list a

variety of functions (i.e., "May carry up to 80 pounds," "Able to walk w/o restrictions," "Able to work near machinery," "Able to bend/turn/twist wrist," etc.) and has a space for the medical providers to circle "yes" or "no" regarding whether the patient is capable of performing the given function. (See Doc. 60-3, p. 2.) The form also has an area where it provides "[c]omments" or makes specific requests to the provider. (Id.) In her deposition, Ms. Monroe explained that these forms are used "[a]ny time that someone has a condition . . . that could cause them to be harmed if [Defendant] put them in [one of its] jobs," and that she uses these forms so that the applicant's physician can tell her "what they can and can't do." (Doc. 61-1, p. 19.)

The comments section of the form provided to Plaintiff's general physician stated, in bold letters, "Please evaluate left wrist." (Id.) It also provided some information about what the job could entail. (Id. ("May be lifting 40+ pounds, may be walking or standing, bending or stooping, may be pulling skins, cutting with a knife or scissors . . . . May be doing 8+ hours of repetitive work that involves hands, wrists, elbows, and shoulders.").) The general physician circled "yes" in response to all of the items on the form, wrote "No medical limit" next to "Max push/pull weight," and signed the form at the bottom. (Id.)

Plaintiff also provided a form to Dr. Robert King at the Georgia Eye Institute. (Doc. 50-4, p. 38.) According to Plaintiff, he told Dr. King that this job would involve "seasoning the chicken and putting it in the tubs." (Doc. 66-1, pp. 3–6.) Plaintiff did not inform Dr. King that any machinery would be involved in the job. (Id.) The comments section of the form provided to Dr. King stated, in bold letters, "Please evaluate vision vs[.] work environment." (Id.) It also provided the same information as the general physician's form (described above) regarding what the job could entail. (Id.) While Dr. King's responses on the form affirmed that Plaintiff could perform most of the listed functions, he answered "no" regarding whether Plaintiff was "[a]ble to operat[e]

equipment," and added a handwritten note stating: "not able to see well enough to operate equipment[;] can work in environment that does not require good vision." (Doc. 50-4, p. 38.) Although he answered "yes" to the query "[a]ble to climb w/o restrictions," Dr. King wrote "not high levels" in the comment area next to it. (Id.) In the comments section where he was asked to "evaluate vision vs[.] work environment" (with the information about what the job could entail stated thereunder), he wrote: "Patient is visually impaired and is able to do job that does not require good vision." (Id.) An additional note written by Dr. King in the bottom margin states: "Can use scissors only. No sharp knives, saws, or machinery. Can work in job applied for." (Id.)

Plaintiff returned the Pre-employment Medical Screening Forms to Defendant. (Doc. 63-1, p. 65.) Based on the form completed by Dr. King, Defendant determined that Plaintiff could not perform any of the jobs on the seasoning line, including "marination mixer," either "with or without reasonable accommodation or without posing a direct threat to himself or others." (Doc. 50-8, p. 3; doc. 61-1, pp. 26–27.) According to Plaintiff, Ms. Monroe told him that he could not work at Claxton Poultry until he got his "eyes fixed." (Doc. 63-1, pp. 65, 69.) According to Plaintiff, he then asked Monroe if he could bring his vocational resource counselor to the plant and "let him walk through the plant and see the departments that were available for [him] to work," but Ms. Monroe told him no. (Doc. 63-1, p. 70; doc. 65-1, pp. 3–5.)

## III. Plaintiff Seeks Legal Recourse

After filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), (doc. 50-4, p. 39; doc. 66-1, p. 12), Plaintiff requested a Notice of Right to Sue from the EEOC, (doc. 5, p. 5). In December 2017, he filed a Verified Complaint initiating this lawsuit, (doc. 1), and subsequently filed the Amended Complaint, (doc. 5), alleging that Defendant violated his rights under the ADA. Specifically, he alleges that Defendant refused to

hire him because of his disability and "refused to engage in the interactive process regarding any accommodation necessary for the Plaintiff to perform the essential functions of the job." (Id. at p. 6). Defendant filed a Motion for Summary Judgment on February 4, 2019, (doc. 50), and Plaintiff filed a Response, (doc. 57). Defendant filed a Reply, (doc. 71), and Plaintiff filed a Sur-Reply, (doc. 73).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does not exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. <u>Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County</u>, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing <u>Rodriguez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Id.</u> (citation and emphasis omitted).

## DISCUSSION

In his Amended Complaint, Plaintiff purports to bring claims against Defendant for violating the ADA by "fail[ing] to hire and fail[ing] to engage in the interactive process with Plaintiff." (Doc. 5, p. 1.) The Amended Complaint focuses on Defendant's failure to hire him in June 2016 and failure to "engage in the interactive process regarding any accommodation necessary for the Plaintiff to perform the essential functions of the job." (<u>Id.</u> at pp. 4, 6.) In Count One of the Amended Complaint, Plaintiff alleges that he is a "qualified individual" pursuant to the ADA because, "according to [his] doctors," he, with or without reasonable accommodations, "can perform the essential functions of the job for which [he] applied," which he alleges "did not require the use of machines." (<u>Id.</u> at pp. 13–14.) Plaintiff then asserts, within Count I, that Defendant violated the ADA "by denying [him] a job that he was qualified to perform," by "failing to hire him," and by "failing to engage in an interactive process regarding a reasonable accommodation." (<u>Id.</u> at pp. 14–15.)

"The ADA was enacted 'to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life.'" Harrison v. Benchmarks Elecs. Huntsville, Inc., 593 F.3d 1206, 1212 (11th Cir. 2010) (citation omitted.)  In relevant part, the ADA provides that no covered entity (i.e., employer or prospective employer) "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . or discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Title VII's employment discrimination burden-shifting framework applies to ADA claims. Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000).  Plaintiff must prove three elements to make the necessary *prima facie* case of disability discrimination: "(1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255–56 (11th Cir. 2007).

## I.      Whether Plaintiff Had or Was Perceived to Have a Disability

Defendant does not dispute, at least for purposes of summary judgment, that Plaintiff had or was perceived to have a disability when he applied for a job in June of 2016.  (Doc. 50-1, p. 10.)  (Defendant also does not dispute that it is a covered entity subject to the requirements of the ADA.)  Instead, Defendant focuses its Motion for Summary Judgment on the theory that Plaintiff cannot show that he was a "qualified individual" as contemplated by the ADA in satisfaction of the second prong.  (Doc. 50-1, p. 10.)

## II.     Whether Plaintiff Was a "Qualified Individual" Under the ADA

Under the ADA, "a 'qualified individual with a disability' is an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires.'" <u>Gordon v. E.L. Hamm & Assocs.</u>, 100 F.3d 907, 911 (11th Cir. 1996) (quoting 42 U.S.C. § 12111(8)). Thus, a person who is not able to perform the essential functions of a job even with a reasonable accommodation is not a qualified individual and, therefore, not covered by the ADA. <u>See</u> <u>Davis v. Florida Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir. 2000). Essential functions are "the fundamental job duties of the employment position" but do not include "the marginal functions of the employment position." 29 C.F.R. § 1630.2(n)(1). Thus, in order to assess whether Plaintiff was a "qualified individual," the Court first must determine the essential functions of the job he applied for, and then the Court will turn to whether he could perform those functions.

### A. Defendant Has Established the Essential Functions of the Marination Mixer Position.

In its Motion for Summary Judgment, Defendant states that the essential functions of the position are set forth in the Job Safety Analysis form for the position, and they specifically include accurately weighing, measuring, and mixing the ingredients, operating machinery, and monitoring the operation of the machinery to ensure the marination process is properly completed. (Doc. 50-1, pp. 11–13.) Plaintiff's dispute on this topic focuses on challenging Defendant's right to rely on the Job Safety Analysis form as evidence of the essential functions. (Doc. 57, p. 11.)

Whether a certain job function is essential is "evaluated on a case-by-case basis by examining a number of factors," <u>D'Angelo v. ConAgra Foods, Inc.</u>, 422 F.3d 1220, 1230 (11th Cir. 2005) (quoting <u>Davis</u>, 205 F.3d at 1305), and not just a written job description (such as the Job Safety Analysis form). ADA regulations provide a number of considerations including but not limited to:

> (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the amount of time spent on the job performing the function, (4) the consequences

of not requiring the incumbent to perform the function, (5) the terms of a collective bargaining agreement, (6) the work experience of past incumbents in the job; and (7) the current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Notably, the first factor—the employer's judgment—is "'entitled to substantial weight in the calculus," though "[it] alone is not conclusive." Lewis v. City of Union City, 934 F.3d 1169, 1182 (11th Cir. 2019) (quoting Holly, 492 F.3d at 1285). Here, the judgment of Defendant is that accurately measuring and mixing chicken seasoning and operating and monitoring machinery are essential functions of the Marination Mixer position. (Doc. 50-8, p. 2.) Specifically, Mark Bland, the head of Defendant's human resources department, stated in an affidavit that "[w]eighing, mixing, measuring, and monitoring with accuracy are, in the judgment of [Defendant], essential functions of the Marination Mixer position" and the "Marination Mixer must operate the Hopper, Tumbler, Marination Tank, and hand trucks." (Id.) This factor thus weighs heavily in favor of finding that these tasks were essential functions of the position.

As to the second factor, Defendant offers its Job Safety Analysis form as evidence of the company's written job description. (Doc. 50-1, p 11.) Plaintiff argues that these forms should not be used as evidence here because the forms are not specifically titled as job descriptions. (Doc. 57, p. 10). However, in D'Angelo v. ConAgra Foods, Inc., the United States Court of Appeals for the Eleventh Circuit considered a Job Safety Analysis form, along with other even less formal documents such as a handwritten note, as evidence on the issue of whether working on a conveyor belt was an essential function of a given job. 422 F.3d at 1231. As such, this Court will consider Defendant's forms in analyzing the second factor.

The form for the "marination mixer" position lists the following "[e]quipment [o]perated" on the job:  hopper, tumbler, hand truck, and marination tank.  (Doc. 50-9, p. 2.)  In addition, the form's "Procedure-step by step" section states:

> 1. Obtain seasoning ingredients
> 2. *Weigh & mix marination by recipe*
> 3. *Load batch into tumbler* and tumble required time
> 4. Unload batch at end of cycle
> 5. Reload and repeat
> 6. Communicate with supervisor and scoopers to get product scooped into bags.

(Id.) (emphases added).  Thus, the second factor also supports a finding that weighing, measuring and mixing seasoning and ingredients, operating machinery, and monitoring the operation of the machinery are essential functions of the position.

The next factor specifically addressed by the parties involves the consequences of not requiring the employee to perform the at-issue functions.  The evidence shows that products on the seasoning line must be seasoned "exactly to customer specifications," which vary from customer to customer.  (Doc. 50-8, p. 2.)  One of these customers was Chick-Fil-A, whose business was worth approximately 50 million dollars to Defendant.  (Doc. 50-5, p. 16.)  Plaintiff offers no evidence of his own to show that there would be no adverse consequence if he were not required to accurately measure or mix seasoning or to load, operate and monitor the machinery that does the mixing.  Even drawing all reasonable inferences in favor of Plaintiff, the evidence indicates that not requiring an employee to measure ingredients to a customer's specifications, to operate the machinery to mix those ingredients and marinate the chicken, and to monitor that machinery could significantly disrupt the facility's operations and cost Defendant significant business.

While neither party submitted specific evidence about the amount of time spent measuring and mixing seasoning or operating and monitoring machinery, the Court notes that the Job Safety Analysis form's step-by-step description of the job, along with Mr. Bland's affidavit testimony,

indicates that the majority of a marination mixer's active working time is spent measuring/weighing the ingredients, loading mass quantities of the ingredients into large machines and monitoring those machines, and unloading the mixed batches of the ingredients from the machines. (See Doc. 50-9, p. 2; doc. 50-8, p. 2.)

The remaining factors in the essential function analysis are inapplicable here, as the record contains no evidence of a collective bargaining agreement, nor any evidence concerning the work experience of either past marination mixers or employees currently holding that position.

The Court emphasizes that Plaintiff has not offered any evidence tending to raise a question of fact as to whether these were indeed essential functions of the job, or even as to whether different types of tasks are actually the essential functions of the job. Instead he argues that "a jury would be justified in concluding that having 20/20 vision is not an essential function of the job," and that "being able to perform each and every job on the [seasoning] line is not an essential function of the job for which [he] applied." (Doc. 57, p. 11.) These cursory arguments do not speak to any of the factors and do not provide a basis for calling into question whether the job functions delineated by Defendant are indeed essential to the job. Thus, after analyzing the factors for which evidentiary support has been offered, the Court finds as a matter of law that weighing, measuring and mixing seasoning and ingredients, operating machinery, and monitoring the operation of the machinery were essential functions of the marination mixer position.

**B.  Plaintiff Has Not Made a *Prima Facie* Showing that He Could Perform the Job With or Without Reasonable Accommodations.**

Having determined that accurately weighing, measuring, and mixing the ingredients, operating the machinery and equipment, and monitoring the operation of the machinery are essential functions of the at-issue job, the Court turns to the next step in the inquiry, which is to

determine whether Plaintiff could have performed these essential functions with or without reasonable accommodations. 42 U.S.C. § 12111(8) (2016).

### 1. Plaintiff Has Not Made a Showing that He Could Perform the Job Without Accommodations.

In his Sur-reply, Plaintiff appears to argue, for the first time, that there is sufficient evidence upon which a reasonable jury could conclude that he was able to perform the essential duties of the job without any accommodations. (Doc. 73, pp. 4–5.) In support, Plaintiff points to the two Pre-employment Medical Screening Forms, which he claims indicate that both physicians determined he would be able to handle the job even without an accommodation. (Doc. 60-2, p. 2; doc. 60-3, p. 2.) Specifically, Plaintiff emphasizes that his general physician answered "yes" regarding his ability to handle all of the listed duties and responsibilities. (Doc. 60-3, p. 2.) Plaintiff also emphasizes that Dr. King, his eye doctor, wrote at the bottom of his Pre-employment Medical Screening Form that he could "work in job applied for." (Doc. 60-2, p. 2.) Plaintiff also points to his interview with Mr. Prater, during which he claims he told Mr. Prater about his eye condition and that Mr. Prater told him that the position "was a pretty easy job" and "was something [he could] do." (Doc. 63-1, p. 62.) He repeatedly states that, based on these comments, he "believed" he was a qualified individual for the at-issue position. (Doc. 73, p. 4.)

The Court finds that neither doctor's screening form provides evidence upon which a reasonable jury could find that Plaintiff could perform the essential functions of the job without any accommodations. First, in completing the screening form regarding Plaintiff's abilities, the general physician was told specifically to evaluate Plaintiff's left wrist. Thus, there is no indication that the physician was providing any opinion regarding the effect Plaintiff's vision impairment would have on his ability to perform the job. As to Dr. King, the undisputed facts establish that he was not provided a specific description of the tasks involved in the job. Thus his opinion that

Plaintiff could work the job has *de minis* probative value, if any, due to its lack of relevancy and foundation. While the screening form provided some general information about skills and abilities that the job "may" require, it did not provide a description of what the performance of the job would entail or what kind of equipment and machinery Plaintiff would be operating (or working in the vicinity of). Furthermore, Plaintiff's own description of the job as involving simply "seasoning" chicken and putting it in a "tub" did not provide Dr. King with a meaningful understanding of the true nature of the job (and it instead downplayed the extent to which Plaintiff would have to work with and around large equipment and machinery). That Dr. King did not grasp the true nature of the job is even more apparent in light of his specific note that Plaintiff "is not able to see well enough to operate equipment" and his admonition of "no . . . machinery." When taken as a whole, Dr. King's evaluation actually supports Defendant's position that Plaintiff could not perform the essential functions of the job without accommodation.

Finally, in the face of the undisputed evidence regarding the nature and risks of the essential functions of the job (including, most importantly, the amount of interaction with heavy equipment and machinery and the meticulousness required in measuring seasonings), Mr. Prater's statements to Plaintiff during the interview would not provide a reasonable jury with a basis for finding that Plaintiff could perform the job without a reasonable accommodation. The alleged comments were made during the application and interview process, and the parties agree that the tentative job offer Mr. Prater made to Plaintiff at that time was conditioned upon the plant nurse clearing him for the job after reviewing all necessary medical documentation. Even assuming Plaintiff told Mr. Prater that he had vision problems and was legally blind, there is no evidence that Mr. Prater knew how or the extent to which Plaintiff's vision was limited and whether or how it would impact his ability to perform the job. Indeed, that determination was prudently left for the next step of the process,

when Plaintiff was required to complete a medical questionnaire and to obtain completed Pre-employment Medical Screening Forms as requested by the plant nurse.

In light of the foregoing, Plaintiff has failed to make a *prima facie* showing that, even with his vision limitations, he could perform the essential functions of the marination mixer job without any accommodations.

### 2. Plaintiff Has Not Made a Showing that He Could Perform the Job *With* Accommodations.

Plaintiff still may be deemed a "qualified individual" if he can show that he could perform the essential functions of the job if certain reasonable accommodations were made for him. The ADA requires an employer to make "reasonable accommodations" to an otherwise qualified employee with a disability "unless doing so would impose [an] undue hardship." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (citing 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.9(a)). An accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question. Id.

"The employee has the burden of identifying an accommodation and demonstrating that it is reasonable. Assuming [the employee] cannot do so, the employer has no affirmative duty to show undue hardship. Moreover, an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" Frazier-White v. Gee, 818 F.3d 1249, 1255–56 (11th Cir. 2016) (internal citations omitted), *cert. denied* 137 S. Ct. 592 (2016).

The regulations implementing the ADA contemplate two types of "reasonable accommodations" that could be applicable here:

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]

29 C.F.R. § 1630.2(o)(1)(i–ii).

The parties' briefs seem to focus on the latter type of reasonable accommodation—that is, whether Plaintiff requested an accommodation to enable him to actually perform the essential functions of the job. In his briefs, however, Plaintiff neglects to identify any sort of modification or adjustment to the work environment or the way the marination mixer job is performed that arguably would have allowed him to perform the essential functions of the job. The closest he comes is emphasizing evidence that all of the employees who work on the seasoning line are cross-trained to be able to perform all of the jobs on the line (not just the one to which they are assigned). Plaintiff avers, baldly, that "it would [therefore] seem a natural place where a reasonable accommodation could easily be made, if needed," (doc. 57, pp. 9–10), but Plaintiff does not elaborate on what reasonable changes could be made to enable him to perform the essential functions of the job simply by virtue of the fact that he and the other employees would be trained to handle each other's duties, if necessary. Moreover, a defendant is not required to reallocate essential functions, such as the functions of measuring ingredients and operating machinery in this case, to other employees, so Plaintiff would not be entitled to be relieved of those duties simply because another employee might have been trained and able to cover them. See Holbrook v. City of Alpharetta, 112 F.3d 1522, 1527–28 (11th Cir. 1997); Webb v. Donley, 347 Fed. Appx. 443, 446 (11th Cir. 2009) ("[A]n employer is not required to reallocate job duties to change the functions of a job.") (citing Earl, 207 F.3d at 1367). Moreover, there is no evidence that Plaintiff made a specific demand for this particular type of accommodation (reallocation of some duties).

Plaintiff attempts to satisfy his burden by claiming that the "reasonable accommodation" that he requested was to have his vocational counselor come visit the plant. (Doc. 57, pp. 7–9.) However, having a third party come to the plant and observe the marination mixer job in action does not comport with the second definition of a reasonable accommodation because a site visit would not constitute a "modification[] or adjustment[] *to the work environment*, or to the *manner or circumstances under which the position . . . is customarily performed*, that [would] enable [Plaintiff] to perform the essential functions" of the job. 29 C.F.R. § 1630.2(o)(1)(ii) (emphases added). A site visit by the vocational counselor would not, in and of itself, enable Plaintiff to perform the essential functions of the job despite his vision issues.

Upon examination of the relevant law and Plaintiff's briefs, Plaintiff's "reasonable accommodation" claim seems instead to be that he requested a reasonable accommodation *in the job application process,* per 29 C.F.R. § 1630.2(o)(1)(i). That is, Plaintiff appears to be arguing that Defendant wrongfully refused to make an "adjustment[] to [the] application process" (i.e., permitting an out-of-the-ordinary observational site visit by a vocational counselor) in order "[to] enable [Plaintiff] to be considered for the position." 29 C.F.R. § 1630.2(o)(1)(i).

Closely related to this claim is Plaintiff's separate claim, explicitly alleged in the Amended Complaint, that Defendant violated the ADA by failing to "engage in the interactive process regarding any accommodation necessary for the Plaintiff to perform the essential functions of the job." (Doc. 5, p. 15.) This claim pertains to the following provision of the federal regulations implementing the ADA:

> To determine the appropriate reasonable accommodation it *may* be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. §1630.2(o)(3) (emphasis supplied).  Plaintiff claims that, upon his making the request for the site visit "accommodation," Defendant was required (but failed) to "engage in the interactive process" with him.

The Court addresses the "failure to engage in the interactive process" claim first.  First, the Court notes that the ADA provides no cause of action for failure to investigate possible accommodations. McKane v. UBS Fin. Servs., Inc., 363 F. App'x 679, 681 (11th Cir. 2010) (citing Willis, 108 F.3d at 285).   Nonetheless, even assuming Plaintiff does have a valid cause of action based on this claim, the Court finds that Plaintiff could not prevail on it because the undisputed evidence indicates that, after learning from Plaintiff that he had a vision issue, Defendant did indeed initiate and engage in an interactive process to "identify the precise limitations resulting from that disability," by requesting that his eye doctor, Dr. King, complete a Pre-employment Medical Screening Form.  Through this form, Dr. King identified precise limitations resulting from Plaintiff's vision issue: that he is "visually impaired," that he is "not able to see well enough to operate equipment," that he is only able to do a job if it "does not require good vision," and that he should not use "sharp knives, saws or machinery."  While Dr. King did (confusingly) also state that Plaintiff could perform "the job applied for," he did not provide any suggestions on *how* Plaintiff could perform the marination mixer job despite his repeated and explicit admonitions that Plaintiff is not capable of operating equipment and machinery or doing jobs requiring good vision. In the face of this clear first-hand information from Plaintiff's treating eye doctor, and knowing that the essential functions of the job require the use of machinery and equipment and the need for good vision, Defendant reasonably concluded that there were no "potential reasonable accommodations that could overcome those limitations."  The Court is not aware of any authority

that required Defendant to permit a vocational specialist to visit the plant to offer a second opinion (particularly one that would be secondary to that of the specializing and treating physician).

The "failure to engage in the interactive process" claim also fails because Plaintiff has not pointed to a "modification[] or adjustment[] to the work environment, or to the manner or circumstances under which the [marination mixer] job . . . is customarily performed," 29 C.F.R. § 1630.2(o)(1)(ii), that Defendant could have undertaken to enable him to perform the essential functions of the job. Even assuming, *arguendo*, that Defendant had an affirmative duty to engage in the interactive process and failed to do so, "where a plaintiff cannot demonstrate [a] reasonable accommodation, the employer's lack of investigation into reasonable accommodation is unimportant." Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir. 1997); Lucas, 257 F.3d at 1256 n. 2; Earl, 207 F.3d at 1367; Webb, 347 Fed. Appx. at 446. As the Eleventh Circuit explained in Moses v. Am. Nonwovens, Inc.,

> We are persuaded that [a defendant's] failure to investigate [does] not relieve [the plaintiff] of his burden of producing probative evidence that reasonable accommodations were available. A contrary holding would mean that an employee has an ADA cause even though there was no possible way for the employer to accommodate the employee's disability. Stated differently: An employer would be liable for not investigating even though an investigation would have been fruitless.

97 F.3d 446, 448 (11th Cir. 1996). The Eleventh Circuit has further elaborated that the ADA is not intended "to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." Willis, 108 F.3d at 285. Here, Plaintiff has not identified any proposed modification to the job that would enable him to perform its essential functions (much less has he shown that any such accommodation would be reasonable). As a result, his claim fails regardless of whether Defendant truly did fail to engage in the interactive process.

Next, the Court turns to Plaintiff's claim (to the extent he has intended to make one) that, in requesting a site visit with his vocational counselor, he was seeking a modification or adjustment to the job application process to accommodate his vision issues (pursuant to 29 C.F.R. § 1630.2(o)(1)(i)). While Plaintiff contends that he asked Defendant if his vocational counselor could come "walk through the plant and see the departments that were available for [him] to work," this does not qualify as an accommodation that Defendant should have provided to him in order for him to fully participate in Defendant's application process or medical evaluation process. Stated another way, this was not a request for an "accommodation to ameliorate the effect of his disability in connection with the application process." E.E.O.C. v. BNSF Ry. Co., 124 F. Supp. 3d 1136, 1158 (D. Kan. 2015) (approving of the employer's refusal to provide the applicant a list of the essential functions of the job and to permit him to "demonstrate" his abilities to perform those duties) *aff'd sub nom.* Equal Emp't Opportunity Comm'n v. BNSF Ry. Co., 853 F.3d 1150 (10th Cir. 2017). In fact, the undisputed evidence shows that Plaintiff's vision limitation was actually accommodated here, as he was permitted to have someone (his driver) assist him with reading and completing the application paperwork. This individual also accompanied him when he returned to submit the completed Pre-employment Medical Screening forms. There is no evidence Plaintiff asked for (or needed) anything else to assist him with completing the application process in order to be considered for the job. Furthermore, Plaintiff "points to no authority suggesting that he is entitled to an accommodation [such as a site visit by a counselor] to assist him in proving to [Defendant] that he could perform the essential functions of the position despite the results of the medical evaluation process." Id.

Additionally, Plaintiff has not shown—and, in light of the foregoing, cannot show, as he must—that the requested "accommodation" (allowing a third party to come into the plant and

inspect employee activities) was a reasonable one, nor has he provided authority establishing that Defendant's duty to engage in an interactive process required it to permit the vocational counselor to do a site visit. See Ammons v. Aramark Unif. Servs., Inc., 368 F.3d 809, 819 (7th Cir. 2004) ("The duty to engage in an interactive process does not mandate a meeting with an employee's . . . vocational counselor. . . . The ADA envisions no more than 'a flexible, interactive process by which the employer and employee determine the appropriate reasonable accommodation.'") (quoting Rehling v. City of Chicago, 207 F.3d 1009, 1015 (7th Cir. 2000)).

In closing, the Court emphasizes that, despite having had the benefit of discovery aids throughout this case, Plaintiff has *never* identified an actual reasonable "modification[] or adjustment[] *to the work environment*, or to the *manner or circumstances under which the position* . . . *is customarily performed*, that [would] enable [Plaintiff] to perform the essential functions" of the marination mixer position despite his being legally blind, much less that such modification or adjustment is a reasonable one. 29 C.F.R. § 1630.2(o)(1)(ii).

The facts of this case are fairly straightforward and do not support recovery under the ADA. Plaintiff successfully applied for, was interviewed for, and was conditionally offered a job as a marination mixer in a chicken processing plant. The very purpose (i.e., essential functions) of that job was to load, operate, and monitor very large pieces of machinery that mixed precisely-measured spices, tumbled the chicken with the spices, and moved the marinated chicken out on a conveyor belt in an environment featuring slip and trip hazards and a bevy of other moving machines and equipment. After learning during the medical screening process that Plaintiff had a vision issue, Defendant pursued additional information about his limitations and abilities. When Plaintiff's eye doctor specifically reported that Plaintiff could not work with machinery and equipment and could not do tasks requiring "good vision," Defendant reasonably concluded that

Plaintiff could not perform the essential functions of the job. Plaintiff did not demand any specific "modification[] or adjustment[] *to the work environment*, or to the *manner or circumstances under which the position . . . is customarily performed*, that [would] enable [Plaintiff] to perform the essential functions" of the marination mixer position despite his being legally blind, 29 C.F.R. § 1630.2(o)(1)(ii) (emphasis added), and he still has never identified any such accommodation during the pendency of this lawsuit. As a result, he has failed to make the necessary *prima facie* showing that he is a "qualified individual" under the ADA, and he cannot succeed on his claims that Defendant violated the ADA by failing to hire him or by failing to engage with him in the "interactive process." The Court therefore **GRANTS** Defendant's Motion for Summary judgment as to Plaintiff's ADA discrimination claims.[5]

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES as moot** Plaintiff's Motion for Summary Judgment as to the "after-acquired evidence" defense, but **GRANTS** Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms' Motion for Summary Judgment as to all of Plaintiff's claims against it, (doc. 50). The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment of dismissal and to **CLOSE** this case.

**SO ORDERED** this 27th day of September, 2019.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[5] Since Plaintiff's substantive claims have failed, he is not entitled to any punitive damages, (doc. 5, p. 15). See J. Kinson Cook of Ga., Inc. v. Heery/Mitchell, 644 S.E.2d 440, 449 (Ga. Ct. App. 2007).